Paul Kirsch, Esq. (State Bar No. 127446)
<paul@kirschjansenlaw.com>
Mark Jansen, Esq. (State Bar No. 114896)
<mark@kirschjansenlaw.com>
Kirsch & Jansen LLP
2041 Bancroft Way – Suite 206
Berkeley, CA  94704
(510) 390-8900
*Attorneys for Jeffrey W. Arricale, Plaintiff*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY W. ARRICALE,<br><br>Plaintiff,<br><br>vs.<br><br>LIBERTY COMPANY INSURANCE BROKERS, LLC, and WILLIAM J. JOHNSON,<br><br>Defendant(s). | Case No.:<br><br>**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**<br><br>1. **RETALIATION IN VIOLATION OF THE TAXPAYER FIRST ACT, 26 U.S.C. § 7623(d)**<br>2. **RETALIATION FOR WHISTLEBLOWING, IN VIOLATION OF CAL. LABOR CODE § 1102.5(b)**<br>3. **RETALIATION FOR REFUSING TO PARTICIPATE IN ILLEGAL ACTIVITY, IN VIOLATION OF CAL. LABOR CODE § 1102.5(c)**<br>4. **RETALIATION FOR REFUSING TO PARTICIPATE IN ILLEGAL ACTIVITY, IN VIOLATION OF FLORIDA STATUTE § 448.102**<br>5. **WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**<br>6. **BREACH OF WRITTEN CONTRACT;**<br>7. **BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING** |

COMES NOW Plaintiff JEFFREY W. ARRICALE and alleges as follows:

## SUBJECT MATTER JURISDICTION AND VENUE

1.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331, because the principal claim alleged herein arises under the laws of the United States, to wit, the Taxpayer First Act, 26 U.S.C. § 7623(d).

2.     Jurisdiction is also proper in this Court pursuant to 28 U.S.C. § 1340, because the principal claim alleged herein arises under an Act of Congress providing for internal revenue, to

1  wit, the Taxpayer First Act, 26 U.S.C. § 7623(d).

2      3.      Jurisdiction over all other claims in this action is proper in this Court pursuant to 28

3  U.S.C. § 1367, because they are so related to claims in the action within such original jurisdiction

4  that they form part of the same case or controversy under Article III of the United States

5  Constitution.

6      4.      Venue is proper in the United States District Court for the Central District of California

7  pursuant to 28 U.S.C. 1391(b) because this is a judicial district in which:

8          a.   a substantial part of the events and omissions giving rise to the claims alleged herein

9               occurred,

10         b.   Defendant LIBERTY COMPANY INSURANCE BROKERS, LLC ("Liberty")

11              does business and has its principal place of business, and is thus subject to the

12              Court's *in personam* jurisdiction with respect to this action;

13         c.   Defendant WILLIAM J. JOHNSON ("Mr. Johnson" or "Defendant Johnson") has

14              his principal residence and does business and is thus subject to the Court's *in*

15              *personam* jurisdiction with respect to this action; and

16         d.   Liability for most of the acts and conduct complained of herein has arisen.

17

18                                      **OVERVIEW**

19     5.      This case involves illegal retaliation against Plaintiff JEFFREY W. ARRICALE for

20  raising concerns about the legality and propriety of acts and practices in which Defendants have

21  engaged (hereinafter, the "Acts and Practices"), and for refusing to participate in activity that he

22  believed to be improper, unethical and illegal.

23     6.      The Acts and Practices concern:

24         a.   The assessment and payment of income and payroll taxes due and owing to the

25              United States of America, the State of California and other states, by both

26              Defendant LIBERTY COMPANY INSURANCE BROKERS, LLC ("Liberty"), as

27              well as by various officers and employees of Liberty;

28         b.   The use of "asset purchase" provisions in agreements with newly hired workers,

whereby Liberty characterized up-front grants of equity, which were incentives to the workers to leave their former employers and join Liberty, as purported "purchases" of intangible assets, such as the "personal goodwill" of the workers in purported "books of business";

c. The creation of documents concerning the issuance of an equity interest in Liberty to Liberty's President, Jerry Pickett ("Mr. Pickett"), which Mr. Arricale believed to be improper; and

d. The use of unorthodox methodologies for valuing Liberty's equity, which Mr. Arricale likewise believed to be improper.

7.      In or around 2021, Mr. Arricale began communicating his concerns about the propriety and legality of the Acts and Practices to various officers and executives of Liberty, including: Defendant William A. Johnson ("Mr. Johnson"); Mr. Pickett; and Christopher A. Pesch, Esq. ("Mr. Pesch"), who was Liberty's Chief Legal Officer.

8.      Thereafter, he continued communicating such concerns to Mr. Johnson, Mr. Pickett and Mr. Pesch, as well as to other high-level officers and executives of Liberty, and members of its Board of Directors.

9.      Mr. Arricale also communicated such concerns to Liberty's outside auditors.

10.     In addition, he advised Mr. Johnson and other executive officers at Liberty that he would not sign certain documents in connection with an application by Liberty for a credit facility without disclosing the Acts and Practices to the anticipated lenders.

11.     In response, Liberty and Mr. Johnson retaliated against him by, among other things, relieving him of his employment responsibilities, and then subsequently terminating his employment.

12.     Such retaliation was illegal.

## **THE PARTIES AND *IN PERSONAM JURISDICTION***

13.     Plaintiff JEFFREY W. ARRICALE ("Mr. Arricale") is a resident of Dade County, Florida.

14.    Mr. Arricale is the former Chief Financial Officer ("CFO") of Defendant LIBERTY COMPANY INSURANCE BROKERS, LLC ("Liberty").

15.    Defendant Liberty is a limited liability company organized and operating under the laws of the State of Delaware.

16.    Liberty is a large, privately held insurance brokerage company with offices and subsidiaries located throughout the United States.

17.    Although it is nominally headquartered in Gainesville, Florida, Defendant Liberty's principal place of business is at 5955 De Soto Ave #250, Woodland Hills, CA 91367.

18.    Most of Liberty's senior executives, including Defendant WILLIAM J. JOHNSON ("Mr. Johnson"), work in the Woodland Hills office.

19.    Other Liberty executives are located in and work in various other cities and municipalities in the United States of America.

20.    This Court has personal jurisdiction over Defendant Liberty because it does business in, and its principal place of business is in, Los Angeles County, California.  In addition, most of the acts and conduct complained of herein occurred in Los Angeles County, California.

21.    Defendant WILLIAM J. JOHNSON ("Mr. Johnson" or "Defendant Johnson") is a natural person residing in Los Angeles County, California.

22.    Mr. Johnson is currently, and on information and belief has at all relevant times been, the founder, chairman and Chief Executive Officer ("CEO") of Liberty.

23.    This Court has personal jurisdiction over Defendant Johnson because he resides in and does business in Los Angeles County, California.  In addition, many of the acts and conduct by him that are complained of herein occurred in Los Angeles County, California.

24.    Other Liberty executives are located in and work in various other cities and municipalities in the United States of America.

## FACTUAL ALLEGATIONS

### I.    Liberty's Engagement of Mr. Arricale as Chief Financial Officer

25.    In or about February 2021, Mr. Johnson hired Mr. Arricale to be Liberty's Chief

Financial Officer ("CFO").

26.   Mr. Arricale began his employment as CFO in or about March 2021.

27.   When Mr. Johnson first interviewed Mr. Arricale, he told him of his goal of having Liberty make an initial public offering ("IPO") of its stock.

28.   Thereafter, Mr. Johnson and Mr. Arricale discussed the IPO goal, and the steps that Liberty would have to take to achieve it, on numerous occasions.

29.   Among other steps, Mr. Arricale advised Mr. Johnson that Liberty would need an audit of its financial statements in accordance with the requirements of the Public Company Accounting Oversight Board ("PCAOB audit").

## II.  Liberty's Engagement of Ernst and Young as its PCAOB Auditors

30.   In or around September 2021, at Mr. Arricale's suggestion, Liberty engaged Ernst & Young ("E&Y") to complete and file Liberty's 2020 tax returns, and to conduct the PCAOB audit of its 2020 financial statements.

31.   Thereafter, E&Y's audit team began their work, reviewing accounting and financial records, and supporting documentation.

32.   Consistent with his responsibilities as CFO, Mr. Arricale had conversations with members of the E&Y audit team, answered their questions, provided them information material to the audit, and discussed concerns that they raised.

33.   Among these were concerns about the Acts and Practices.

34.   As the E&Y auditors raised these concerns, Mr. Arricale discussed them with them, and also brought them to the attention of Mr. Johnson, Mr. Pickett, Mr. Pesch and many of Liberty's other highest-level executive officers and directors.

35.   Mr. Arricale also brought them to the attention of Mark Biderman, a member of Liberty's Board of Directors and the Chair of the Board's Audit Committee.

36.   In bringing these concerns to the attention of Liberty's highest-level executive officers and board members, Mr. Arricale explained his concern that such Acts and Practices appeared to violate tax and other laws, both federal and state, as well as the fiduciary and contractual duties that

Liberty had and continues to have to its partners, investors and creditors.

### III.  Negotiations for an Expanded Credit Facility

37.   During this same time period, while E&Y was conducting the PCAOB audit, Liberty was also negotiating with a consortium of banks, including J.P. Morgan ("JPM") for an expanded credit facility.

38.   A "credit facility," like a revolving "line of credit," is a type of loan that the borrower can draw down over a long period of time.

39.   In order to finalize such an arrangement, Mr. Arricale would be expected to sign a series of agreements containing numerous representations and warranties concerning Liberty's financial condition.

40.   Concerned about the Acts and Practices by Liberty that he believed violated federal and state tax laws, as well as Liberty's and its officers fiduciary duties to their partners, members and other stakeholders, Mr. Arricale began to advise others at Liberty that unless these practices were corrected or found to be legitimate by a third-party legal review, he would refuse to sign the credit facility agreements.

### IV.  Events of September and October 2022

41.   The E&Y auditors' and Mr. Arricale's concerns continued to increase in September 2022.

42.   By that time, the auditors had become distrustful of the documents that Liberty had given to them relating to its issuance of equity to Mr. Pickett.

43.   Not only did the E&Y auditors discuss this distrust with Mr. Arricale, but as noted above, they eventually asked Liberty to request that the outside law firm that Liberty had engaged to assist it with the planned IPO review some of the issues about which they were concerned.

44.   Throughout September and October 2022, Mr. Arricale continued to have discussions about these issues and the other issues of concern with the E&Y auditors, as well as internally with high-ranking Liberty executives, board members and personnel.

45.   One of those high-ranking Liberty executives told Mr. Arricale that Mr. Johnson had become more determined than ever to continue certain of the Acts and Practices.

46.   Sometime in October 2022, Mr. Arricale learned of a Notice of Proposed Rulemaking by a federal agency regarding a change in its methodology for assessing one of the Acts and Practices about which Mr. Arricale and the auditors were concerned.

47.   Thinking that the notice would be an opportunity to focus Mr. Johnson on this issue, Mr. Arricale attempted to bring it to his attention.  When he did so, however, Mr. Johnson got upset and refused to discuss it.

48.   On or about October 24, 2022, Mr. Arricale stated to a member of Liberty's Board of Directors:  "The more I look at it, the more it appears he [meaning Mr. Johnson] may have been running afoul of the spirit, if not the letter, of the law for some time."

49.   The board member indicated that he would speak to Mr. Johnson.

50.   On October 28, 2022, Mr. Arricale sent an email to two high-ranking Liberty officers discussing the magnitude of that particular issue.

**V.   Events of November 7 and 8, 2022**

51.   On Monday, November 7, 2022, Mr. Arricale had a lengthy conversation about some of the Acts and Practices with two E&Y partners.  One of them was the partner in charge of the audit team at Liberty.  The other was E&Y's West Insurance Sector Leader, who was also the E&Y partner with whom Mr. Arricale had first spoken about undertaking the PCAOB audit of Liberty.

52.   In that conversation, Mr. Arricale and the two E&Y partners discussed certain of the Acts and Practices.

53.   Near the end of that conversation, the two E&Y partners advised Mr. Arricale to put his concerns in writing.

54.   Mr. Arricale then sent to the two E&Y partners an advance copy of a memorandum that he planned to send to Mr. Johnson explaining his concerns.

55.   Later that day, Mr. Arricale advised a high-ranking officer and a board member of Liberty about his conversations with the two E&Y partners, and about the advance copy of the

memorandum that he had sent to them. He also told them that he would not sign the credit facility agreements unless the issues were resolved. Both of them expressed their agreement.

56.    On November 8, 2022, Mr. Arricale spoke again to the E&Y partner in charge of the audit, who advised him that she had spoken to other partners at E&Y, and that until all certain of the issues concerning the Acts and Practices were resolved, E&Y might have to stop working on the audit.

## VI.    Mr. Arricale's Conversation with Mr. Johnson the Morning of November 10, 2022

57.    All of these concerns reached a critical point on the morning of Thursday, November 10, 2022.

58.    On that day, Mr. Johnson telephoned Mr. Arricale, ostensibly to discuss Mr. Arricale's request for a return of $1,750,000 that Mr. Arricale and certain members of his extended family had loaned to Liberty in December 2021.

59.    Mr. Arricale and his family members had loaned the funds to help Liberty weather a liquidity crisis and to make its payroll on time.

60.    In that call, Mr. Johnson stated that he would not return the funds until after the closing of the credit facility that Liberty was at that time actively pursuing, and to which Mr. Arricale had been devoting a substantial portion of his time.

61.    Mr. Arricale expressed shock at this statement, because Mr. Johnson had repeatedly promised that Liberty would return the money sooner, with interest.

62.    Without making any commitment, Mr. Johnson said that he would think about it, and added, "you need to get this credit facility closed."

63.    At the time, and for several months before then, Mr. Arricale had been the primary Liberty executive dealing with the prospective lenders on the contemplated credit facility.

64.    Also during that time, as noted above, he was dealing regularly with the E&Y auditors.

65.    The successful completion of both the 2020 and 2021 audits by March 31, 2023 was critical to the lenders' decisions to go forward with the credit facility.

66.    Mr. Johnson then abruptly changed the subject and asked Mr. Arricale why he was

having discussions with the E&Y auditors.

67.   Mr. Johnson's tone was adversarial and accusatory.

68.   Mr. Arricale explained that the auditors had many questions and concerns relating to the 2020 and 2021 audits, which were still ongoing, and that they regularly reached out to him as the CFO, as well as to Liberty's Chief Accounting Officer and the chair of the audit committee of Liberty's Board of Directors.

69.   Mr. Johnson stated that he wanted to be on those calls.

70.   In response, Mr. Arricale told him that the Chief Accounting Officer, the audit committee chair, and he were in agreement that Mr. Johnson should not interact with the auditors at that point.

71.   Mr. Arricale also explained that the auditors had reached out to him as CFO to discuss their concerns, which included concerns about certain of the Acts and Practices in which Liberty had engaged and was continuing to engage.

72.   Mr. Arricale also reminded Mr. Johnson of prior calls with the auditors that had been counter-productive.

73.   Throughout this conversation, Mr. Johnson made it clear that he was upset.  He frequently interrupted Mr. Arricale, and his tone remained adversarial, accusatory, and angry.

74.   Mr. Arricale also reminded Mr. Johnson that he had previously expressed to him his concerns about the Acts and Practices, and that Mr. Johnson had refused to change them despite having been told that they were at best questionable.

75.   Mr. Arricale explained that he was trying to keep the E&Y auditors from resigning the audit assignment.  He also stated that he had been keeping Liberty's audit committee chair advised of his conversations with them.

76.   At some point, Mr. Johnson asked Mr. Arricale to explain, again, his reasons for being concerned about one particular practice in which Liberty had engaged.

77.   Mr. Arricale then described his reasons.

78.   Mr. Johnson responded that the basis for Mr. Arricale's concern about that particular practice did not apply to Liberty.

79.  Mr. Arricale challenged that assertion, explaining how it did apply.

80.  Mr. Arricale also reminded Mr. Johnson that he had raised his concerns about this particular practice many times, starting over a year earlier, including at a board meeting, as well as with the Human Resources and Legal Departments, but that Mr. Johnson had adamantly refused to change the practice.

81.  Mr. Arricale also discussed certain of the other Acts and Practices with Mr. Johnson as well, including his concerns that they could expose Liberty to significant liability.

82.  In addition, Mr. Arricale told Mr. Johnson that he could not sign the credit agreements without making additional disclosures.

83.  Mr. Arricale added that in his view the executives "needed to come together" as a "management team" and "board of directors" to quantify Liberty's potential exposure, self-report, revise the practices going forward, and accrue for any liabilities.

84.  Mr. Arricale further explained that in his view, the potential liability of the company could be in the "tens of millions" of dollars.

85.  He added that the company needed a full investigation of the practices, and that he believed that the review being performed by outside counsel at the time was inadequate because it was too narrowly limited.

86.  Mr. Arricale also expressed his understanding of the risk of failing to address these issues proactively—namely, that the authorities might assert that the company and its executives had an intent to defraud.

87.  Near the end of the conversation, Mr. Johnson abruptly changed the subject and asked Mr. Arricale what he was working on at that time.

88.  Mr. Arricale answered that he had been working to try to close the credit facility.

89.  He also explained that he was engaged in ongoing conversations with the E&Y auditors to answer their questions, to provide information that they needed to complete the 2020 and 2021 audits, and to do everything he could to avoid having them resign the audit engagement, which he believed was a serious possibility.

90.  Mr. Arricale also stated that he was providing guidance and assistance to other

members of Liberty's leadership team, helping to solve accounting issues that had arisen in connection with Liberty's many subsidiary partnerships, addressing numerous questions from partners in those partnerships, maintaining relationships with bankers and investors, and trying to make the audit committee chair and the entire leadership team aware of the increasing number of issues he was encountering.

91.  Mr. Arricale also added that he was trying to figure out how to raise equity capital, because he was concerned that Liberty could not in good faith sign the agreements needed to close the credit facility, given the representations that those agreements would contain.

92.  Mr. Johnson again reacted angrily.

93.  Mr. Arricale asked whether Mr. Johnson was going to fire him.

94.  Mr. Johnson responded that he and Mr. Arricale "now have a dysfunctional relationship."

95.  Mr. Arricale asked again whether Mr. Johnson was going to fire him.  Mr. Johnson added, "Not right now," and stated that Mr. Arricale's concerns needed to be the audit and closing the credit facility.

96.  Just before the end of the call, Mr. Arricale again brought up the issue of his family members' funds.

97.  Mr. Johnson responded that he needed to think about it.

98.  Mr. Johnson then mentioned that Mr. Pickett had never signed Mr. Arricale's employment agreement.

99.  Mr. Arricale asked whether Mr. Johnson intended to fire him and not honor his employment agreement if Mr. Arricale declined to sign the credit agreement.

100. Mr. Johnson did not answer the question, and simply stated that "we" needed to get the audits done and the credit facility done.

101. At that point, Mr. Arricale told Mr. Johnson that he could not think straight and felt like he was going to throw up.

102. Mr. Johnson responded that they would talk later.

//

**VII. Mr. Johnson's Email About a Previous Audit and Opinion Letter, and his Directive to Mr. Arricale not to Talk Further With the E&Y Auditors or Prospective Lenders**

103. Shortly thereafter, Mr. Johnson sent Mr. Arricale an email noting that Liberty had been "audited" by a state agency several years before then as to one of the Practices that he and Mr. Arricale had discussed at length, and had "cleared the audit."

104. In that same email, Mr. Johnson claimed that Liberty had also been counseled by an outside law firm on that particular Practice, and that the outside firm had advised Liberty at that time that it was "doing things properly."

105. In a follow-up email, Mr. Johnson directed Mr. Arricale to have no further conversations with the E&Y auditors, J.P. Morgan, or any of the prospective lenders until after he and Mr. Johnson had spoken again.

**VIII. Mr. Arricale's November 10, 2022 Memorandum to Mr. Johnson**

106. Later that afternoon, Mr. Arricale sent to Mr. Johnson a memorandum (the "*11/10/2022 Memo*"), which was similar to the one he had provided as an advance copy to the two E&Y partners on November 7, 2022.

107. At the outset of the *11/10/2022 Memo*, Mr. Arricale wrote:

> After our conversation this morning, and your emails asking me not to have solo discussions with the Ernst & Young auditors until we get feedback from [a Liberty board member], or with JP [Morgan] until you and I speak again, I would like to clarify the concerns I raised with you this morning, and which I have been raising in conversations and email communications for some time.
>
> As I have mentioned, I believe that there are several issues that we as a company need to address internally, as well as with EY and our outside legal advisors before closing the credit facility, closing the private placement offering, and to ensure we can retain EY as our auditor. I expected these issues to be resolved by now, but we do not seem to be collectively pushing towards clarity, at least on some of them. I am not privy to conversations you are having with different members of the team and/or the board, so forgive me if steps of which I am unaware are in fact being taken to address the issues.

*11/10/2022 Memo*, at 1 of 3.

108. The *11/10/2022 Memo* then addressed the issues that Mr. Arricale had discussed with

the two E&Y partners with whom he had spoken on Monday, November 7, 2022, and made suggestions of steps that Mr. Arricale believed Liberty should take to address them.

109. Some of these suggestions involved asking outside law firms to review certain of the Acts and Practices.

110. As to Mr. Johnson's assertion that Liberty had previously been audited as to one of those practices, and had previously received a favorable opinion from an outside law firm on it as well, Mr. Arricale stated that he had not seen a report of the audit or the outside law firm's opinion, but noted that the particular practice had begun relatively recently and was unlikely to have been covered by the audit or the law firm's opinion.

111. Mr. Arricale added that if an outside law firm concluded that the practice was legal and defensible, Liberty should get a "solid opinion letter" for its files.

112. In addition, Mr. Arricale discussed that certain of the Acts and Practices could result in liability not only to Liberty, but to other Liberty stakeholders as well.

113. Mr. Arricale also recommended that Liberty stop using certain valuation methodologies.

114. Mr. Arricale also mentioned his concern that Liberty had disclosure obligations to creditors and investors.

115. Mr. Arricale concluded as follows:  "I also believe that taking these steps will put us on a much firmer footing, from both a legal and accounting standpoint, and greatly increase the likelihood of a successful IPO in the future."

## IX.  Liberty's Termination of Mr. Arricale's Duties as CFO

116. On Sunday night, November 13th, Liberty's Chief Strategy Officer called Mr. Arricale by telephone.

117. In that call, the Chief Strategy Officer stated that Mr. Johnson had authorized him to be the "go-between" and work out an "amicable resolution."

118. On Monday, November 14, 2022, an outside counsel for Liberty sent Mr. Arricale a letter informing him of the "immediate cessation of his duties as CFO."  *Id.*

**X.   The Formal Notice of the Termination of Mr. Arricale's Employment**

119. On December 8, 2022, a different law firm representing Liberty sent him a letter to "serve as formal notice" that his employment with Liberty ended on November 21, 2022.

**XI.   Liberty's Termination of E&Y's Audit Engagement**

120. Sometime in December 2022 or early 2023, Liberty terminated the engagement of E&Y as its auditors.

121. On information and belief, it did so in an effort to avoid discovery of its wrongdoing.

**XII.   Conclusions**

122. Liberty's actions of relieving Mr. Arricale of his responsibilities and then terminating his employment were in retaliation for:

    a.   his having raised concerns internally, and with Liberty's outside auditors, about the propriety and legality of the Acts and Practices in which Liberty had engaged and was continuing to engage, and

    b.   his having refused to sign the credit facility without disclosing such practices to the lenders.

**FIRST CAUSE OF ACTION**

**Retaliation for Whistleblowing,**
**In Violation of the Taxpayer First Act, 26 U.S.C. § 7623(d)**

123. The allegations in paragraphs 1 through 122 of this Complaint are repeated and realleged as if set forth in full herein.

124. Subsection (d)(1)(A) of the Taxpayer First Act prohibits employers, their officers and their agents from discharging or otherwise penalizing an employee:

> No employer, or any officer, employee, contractor, subcontractor, or agent of such employer, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment (including through an act in the ordinary course of such employee's duties) in reprisal for any lawful act done by the employee-

> (A) to provide information, cause information to be provided, or otherwise assist in an investigation regarding underpayment of tax or any conduct which the employee reasonably believes constitutes a violation of the internal revenue laws or any provision of Federal law relating to tax fraud, when the information or assistance is provided to . . . a person with supervisory authority over the employee, or any other person working for the employer who has the authority to investigate, discover, or terminate misconduct.

26 U.S.C. § 7623(d)(1)(A).

125. Mr. Arricale provided information to executives at Liberty, including Mr. Johnson, Mr. Pickett, Mr. Pesch, the audit committee chair and other executives and officers of Liberty, regarding conduct by Liberty and its executives and other officers that Mr. Arricale believed then and continues to believe constituted violations of the internal revenue laws of the United States, including but not limited to 26 U.S.C. §§ 3101(a), 3101(b), 3102(a), (b), 3111(a), (b), 3121(a)(1), 3401(a) and 3402.

126. Mr. Johnson and Mr. Pickett were at the time persons with supervisory authority over Mr. Arricale.

127. Mr. Johnson, Mr. Pickett, Mr. Pesch, the audit committee chair and certain other executives and officers at Liberty to whom Mr. Arricale provided such information were persons working for the employer, namely Liberty, who had the authority to investigate, discover, and terminate such misconduct.

128. Other executives and officers at Liberty to whom Mr. Arricale provided such information were persons working for the employer, namely Liberty, who had the authority to investigate and discover such misconduct.

129. Mr. Arricale also provided such information to the E&Y auditors and other E&Y personnel, who were at the time persons "working for the employer"—namely, Liberty—who had the authority to investigate and discover such misconduct.

130. In retaliation for providing such information to the persons identified in the paragraphs above, Mr. Johnson and Liberty retaliated against Mr. Arricale by relieving him of his duties as CFO, and thereafter by discharging him and terminating his employment.

131. As a direct and proximate result of Defendants' unlawful conduct, Mr. Arricale has

suffered and will continue to suffer both physical and emotional injuries, including, but not limited to, depression, stress, humiliation, and anxiety. Mr. Arricale has also suffered loss of earnings and other employment benefits, and consequential financial damages. Mr. Arricale is thereby entitled to fines and penalties authorized by law, as well as general and compensatory damages in amounts to be proved at trial, including two hundred percent of the amount of back pay, special damages, and the costs of litigation including attorneys' fees, together with pre- and post-judgment interest at the legal rate.

132. The conduct of Defendants and their agents and employees, as described herein, was malicious, fraudulent, and/or oppressive or done with a willful and conscious disregard for plaintiff's rights and for the deleterious consequences to Mr. Arricale of Defendants' actions. Consequently, Mr. Arricale is also entitled to punitive damages from Defendants.

## SECOND CAUSE OF ACTION

### Retaliation for Whistleblowing, In Violation of California Labor Code § 1102.5(b)

133. The allegations in paragraphs 1 through 132 of this Complaint are repeated and realleged as if set forth in full herein.

134. Mr. Arricale, while working as the Chief Financial Officer of Defendant Liberty Company Insurance Brokers, LLC learned information that led him to reasonably believe that the business conduct of Defendants Liberty and Mr. Johnson constituted fraudulent and unethical conduct, as well as violations of various federal and state statutes, rules, and regulations, including but not limited to:

    a.  United States Income Tax and Withholding Tax laws, including but not limited to 26 U.S.C. §§ 3101(a), 3101(b), 3102(a), (b), 3111(a), (b), 3121(a)(1), 3401(a) & 3402;

    b.  Cal. Unemployment Ins. Code § 13020(a)(1); Cal. Rev. & Tax. Code § 18662;

    c.  Colorado Revised Statutes § 39-22-604(3)(a), (c), & 1 CCR 201-2-Income Tax, Colorado Rule 39-22-604; Colorado Code §§ 8-70-101, *et seq.*;

       d.  Fl. Stat. § 443.131;

       e.  N.J. Stat. §§ 43:21-7, 54A:7-1, 7-5;

       f.  New York Tax Law §§ 671, 675, 676; N.Y. Worker's Compensation Law § 92;

       g.  Ohio Rev. Code §§ 4141.23, 5747.06, 5747.07(E)(1), (2);

       h.  32 Vermont Stat. Ann. §§ 1329, 5841(a), 5844(a).

135. Mr. Arricale disclosed this information to persons at Liberty who had authority over Mr. Arricale, including Mr. Johnson and Mr. Pickett.

136. Defendants retaliated against Mr. Arricale for reporting the illegal and unethical conduct, in part because they believed that Mr. Arricale had disclosed this information to other persons with the authority to investigate, discover, or correct the violations.

137. Defendants relieved Mr. Arricale from his duties as CFO, and terminated him from his employment at Liberty, because he reported the illegal conduct and because Defendants believed that he would continue to do so.

138. As a direct and proximate result of Defendants' unlawful conduct, Mr. Arricale has suffered and will continue to suffer both physical and emotional injuries, including, but not limited to, depression, stress, humiliation, and anxiety. Mr. Arricale has also suffered loss of earnings and other employment benefits, and consequential financial damages. Mr. Arricale is thereby entitled to fines authorized by law, as well as general and compensatory damages in amounts to be proved at trial, plus pre- and post-judgment interest at the legal rate.

139. The conduct of Defendants and their agents and employees, as described herein, was malicious, fraudulent, and/or oppressive or done with a willful and conscious disregard for plaintiff's rights and for the deleterious consequences to Mr. Arricale of Defendants' actions. Consequently, Mr. Arricale is also entitled to punitive damages from Defendants.

**THIRD CAUSE OF ACTION**

**<u>Retaliation for Refusing to Participate in Illegal Activity,</u>**
**<u>In Violation of California Labor Code § 1102.5(c)</u>**

140. The allegations in paragraphs 1 through 139 of this Complaint are repeated and

realleged as if set forth in full herein.

141. In or about 2022, Liberty was in negotiations to obtain a credit facility from a consortium of banks.

142. At the time, the information possessed by Mr. Arricale about Liberty's Acts and Practices, and ongoing violations of law, led him to believe that it would be improper, unethical and fraudulent for him to sign the credit facility documents without disclosing such information to the credit facility lenders.

143. Based on that belief, Mr. Arricale advised Liberty, Mr. Johnson and other Liberty officers and executives that he would refuse to sign the credit facility documents unless such information was disclosed to the lenders.

144. Liberty and Mr. Johnson then relieved Mr. Arricale from his duties as CFO, and thereafter terminated his employment, in retaliation for his refusal to participate in their ongoing illegal conduct and activities.

145. As a direct and proximate result of Defendants' unlawful conduct, Mr. Arricale has suffered and will continue to suffer both physical and emotional injuries, including, but not limited to, depression, stress, humiliation, and anxiety. Mr. Arricale has suffered loss of earnings and other employment benefits, and consequential financial damages. Mr. Arricale is thereby entitled to fines authorized by law, as well as general and compensatory damages in amounts to be proved at trial, plus pre- and post-judgment interest at the legal rate.

146. The conduct of Defendants and their agents and employees, as described herein, was malicious, fraudulent, and/or oppressive or done with a willful and conscious disregard for plaintiff's rights and for the deleterious consequences to Mr. Arricale of Defendants' actions. Consequently, Mr. Arricale is also entitled to punitive damages from Defendants.

**FOURTH CAUSE OF ACTION**

**Retaliation for Refusing to Participate in Illegal Activity
In Violation of Florida Whistleblower Act, Florida Statutes § 448.102**

147. The allegations in paragraphs 1 through 146 of this Complaint are repeated and

1    realleged as if set forth in full herein.

2         148. As set forth in detail above, Liberty and Mr. Johnson relieved Mr. Arricale from his

3    duties as CFO, and thereafter terminated his employment, in retaliation for his refusal to participate

4    in their ongoing illegal conduct and activities.

5         149. As a direct and proximate result of Defendants' unlawful conduct, Mr. Arricale has

6    suffered and will continue to suffer both physical and emotional injuries, including, but not limited

7    to, depression, stress, humiliation, and anxiety. Mr. Arricale has suffered loss of earnings and other

8    employment benefits, and consequential financial damages. Mr. Arricale is thereby entitled to fines

9    authorized by law, as well as general and compensatory damages in amounts to be proved at trial,

10   plus pre- and post-judgment interest at the legal rate.

11        150. The conduct of Defendants and their agents and employees, as described herein, was

12   malicious, fraudulent, and/or oppressive or done with a willful and conscious disregard for

13   plaintiff's rights and for the deleterious consequences to Mr. Arricale of Defendants' actions.

14   Consequently, Mr. Arricale is also entitled to punitive damages from Defendants.

15

16

17                                **FIFTH CAUSE OF ACTION**

18                    **<u>Wrongful Termination in Violation of Public Policy</u>**

19        151. The allegations in paragraphs 1 through 150 of this Complaint are repeated and

20   realleged as if set forth in full herein.

21        152. Mr. Arricale refused to engage in illegal and unethical conduct and protested such

22   conduct which violated the public policies of the United States, the State of California, and several

23   other states including Colorado, Florida, New Jersey, New York, Ohio, Texas and Vermont.

24        153. Defendants relieved Mr. Arricale of his duties as Chief Financial Officer of Liberty and

25   thereafter terminated Mr. Arricale's employment because, among other things, he:  (a) reported

26   illegal and unethical conduct to Liberty's outside auditors; and (b) refused to engage in Defendants'

27   fraudulent and illegal activity.

28        154. As a direct and proximate result of Defendants' unlawful conduct, Mr. Arricale has

suffered and will continue to suffer both physical and emotional injuries, including, but not limited to, depression, stress, humiliation, and anxiety. Mr. Arricale has suffered loss of earnings and other employment benefits, and consequential financial damages. Mr. Arricale is thereby entitled to fines authorized by law, as well as general and compensatory damages in amounts to be proved at trial, plus pre- and post-judgment interest at the legal rate.

155. The conduct of Defendants and their agents/employees, as described herein, was malicious, fraudulent, and/or oppressive or done with a willful and conscious disregard for plaintiff's rights and for the deleterious consequences to Mr. Arricale of Defendants' actions. Consequently, Mr. Arricale is also entitled to punitive damages from Defendants.

## SIXTH CAUSE OF ACTION

### Breach of Written Contract

156. The allegations in paragraphs 1 through 155 of this Complaint are repeated and realleged as if set forth in full herein.

157. In or around April 2021, Defendant Liberty entered into a written employment agreement with Mr. Arricale.

158. In accordance with the express provisions of that employment agreement, and in accordance with the parties' course of dealing, Mr. Arricale duly performed all of the conditions, covenants, and promises required on his part to be performed in accordance with the terms and conditions of the employment agreement.

159. Defendant Liberty has breached the employment agreement in many ways that include, but are not limited to, refusing to timely provide Mr. Arricale with:

      a.   The equity grant required by section 3.1 of the agreement;

      b.   The base salary required by section 3.2; and

      c.   The bonuses required by section 3.3.

160. As a result, Mr. Arricale has been damaged in an amount to be proved at trial, plus pre- and post-judgment interest at the legal rate, consequential and incidental damages, costs, expenses,

1  and reasonable attorneys' fees pursuant to the Cal. Labor Code to the extent allowed by law.

2

3

4                           **SEVENTH CAUSE OF ACTION**

5           **Breach of the Covenant of Good Faith and Fair Dealing**

6       161.  The allegations in paragraphs 1 through 160 of this Complaint are repeated and

7  realleged as if set forth in full herein.

8       162.  In every contract or agreement there is an implied promise of good faith and fair

9  dealing, pursuant to which each party agrees that it will not do anything to unfairly interfere with

10  the right of any other party to receive the benefits of the contract.

11       163.  Liberty and Mr. Arricale entered into an employment agreement.

12       164.  Mr. Arricale substantially performed his duties or was otherwise excused or prevented

13  from performing his job duties.

14       165.  Liberty breached the contract between the parties when it wrongfully relieved Mr.

15  Arricale from his duties as Chief Financial Officer, and thereafter terminated him from his

16  employment, because he raised concerns about Liberty's illegal and unethical business practices,

17  and refused to sign the credit facility agreements without disclosing his concerns to the lenders.

18       166.  The conduct of Defendants was and is malicious and oppressive, and done with a

19  willful and conscious disregard for Mr. Arricale's rights and for the deleterious consequences to Mr.

20  Arricale of Defendants' actions. Defendants and their agents and employees, authorized, condoned,

21  and ratified the unlawful conduct of each other. Consequently, Mr. Arricale is entitled to punitive

22  damages against each Defendant.

23       167.  As a result of the foregoing, Mr. Arricale has been damaged in an amount to be proved

24  at trial, plus pre- and post-judgment interest at the legal rate, consequential and incidental damages,

25  costs, expenses, and reasonable attorneys' fees to the extent allowed by law.

26  //

27  //

28  //

## REQUEST FOR PUNITIVE DAMAGES

168.  The allegations in paragraphs 1 through 167 of this Complaint are repeated and realleged as if set forth in full herein.

169.  Defendants' acts and conduct as detailed herein constitute deliberate acts of fraud against Mr. Arricale.

170.  Defendants' actions were intended to cause extreme financial harm in Mr. Arricale's life.

171.  Defendants have acted with fraud, malice, and oppression in perpetrating the scheme detailed herein.

172.  Defendants have also wrongfully concealed from Mr. Arricale the true nature of their intentions and business practices to Mr. Arricale's detriment.

173.  Defendants perpetrated the schemes at issue with the deliberate intent of harming Mr. Arricale.

174.  Defendants knowingly assisted each other, facilitated and participated in the fraudulent acts, deceit, concealment, and omissions addressed in this Complaint with the specific intent to harm Mr. Arricale.

175.  Defendants' willful disregard of Mr. Arricale's rights has resulted in substantial damages to Mr. Arricale.

176.  The wrongful conduct alleged herein supports the imposition of punitive damages as to Defendants in a sum sufficient to deter them from future misconduct and acts of fraud.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jeffrey W. Arricale prays for the following relief:

1.  Compensatory damages according to proof;

2.  Special damages according to proof;

3.  Two hundred percent of the amount of back pay and 100 percent of all lost benefits, with interest, pursuant to 26 U.S.C. § 7623(d)(3)(B)(ii);

4.  Punitive and exemplary damages in an amount found appropriate by the trier of fact and

1    according to proof;

2    5.    For restitution of, disgorgement of, and a constructive trust over all ill-gotten gains of

3          Defendants;

4    6.    Equitable and declaratory relief allowed by law;

5    7.    Prejudgment interest and post-judgment interest at the maximum legal rate;

6    8.    Costs of suit;

7    9.    Reasonable attorneys' fees, including pursuant to 26 U.S.C. § 7623(d)(3)(B)(iii) and

8          Labor Code § 218.5;

9    10.   Penalties and fines to the extent permitted by law; and

10   11.   All other, further relief as the Court may deem appropriate in the interests of justice

11                              **DEMAND FOR JURY TRIAL**

12
     Plaintiff Jeffrey W. Arricale hereby demands a trial by jury.
13

14

15   DATED:   February 21, 2025

16
                                        Kirsch & Jansen LLP
17                                      2041 Bancroft Way, Berkeley, CA  94704

18

19                                      By:  Paul F. Kirsch

20                                          */s/ Paul F. Kirsch*

21                                      *and*
                                        Neil Cartusciello (NJ Bar # 000891995)
22                                      Cartusciello & Kozachek LLC
                                        101 Farnsworth Avenue
23                                      Bordentown, New Jersey 08505
                                        (*pro hac vice* application forthcoming)
24

25                                      *Attorneys for Jeffrey W. Arricale, Plaintiff*

26

27

28

                                       - 23 -
                                      COMPLAINT